## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 23-CR-20003** |
| | ) | |
| **TYWAN M. STRINGER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>ORDER</u>

Defendant, Tywan M. Stringer, has been charged via Indictment (#11) with one count of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). Defendant has filed a Motion to Dismiss the Indictment (#33), asserting that § 922(g)(1) is unconstitutional as applied to him.[1] The government has filed a Response (#34). For the reasons set forth below, Defendant's Motion to Dismiss (#33) is DENIED.

## BACKGROUND

Section 922(g)(1) prohibits the possession of a firearm by any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1).

The pretrial services report in this case indicates that Defendant has multiple prior convictions for battery, domestic battery, and/or aggravated battery, as well a

---

[1] The Motion was filed by Defendant's original attorney, but Defendant's newly appointed attorney has affirmatively adopted it.

prior state conviction for unlawful possession of a firearm by a felon. While Defendant characterizes his instant Motion as an as applied constitutional challenge, it contains no assertion that he is a nonviolent felon.

## ANALYSIS

Defendant contends that under the new test announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), § 922(g)(1) must be declared unconstitutional under the Second Amendment. As alluded to above, while Defendant states that he challenges § 922(g)(1) only as it applies to him, the substance of the Motion contains no argument to that effect. In other words, there is no contention that something about Defendant's conduct (i.e., how or where he possessed a firearm) or his personal characteristics (e.g., that he is a nonviolent felon) has not been subject to a historical prohibition, such that the instant charge violates *Bruen*'s directive. Rather, Defendant argues only that he, as a felon, and like all other felons, is still a member of "the people" and therefore protected by the Second Amendment. Because § 922(g)(1) applies only to felons, Defendant's argument is indicative of a facial challenge. Accordingly, the court will begin there.

For its part, the government argues that § 922(g)(1) passes constitutional muster under the *Bruen* test, and that Defendant's challenge fails regardless of whether it is cast as an as applied or facial challenge.

Modern Second Amendment Jurisprudence

The Second Amendment to the United States Constitution reads, in full: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment protects an individual's right to possess a firearm in the home for self-defense. The conclusion in *Heller* rested in large part on an in-depth analysis of the historical underpinnings of the right to bear arms. *Id.* at 581-603. Two years later, in *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010), the Court held that the Fourteenth Amendment makes the Second Amendment fully applicable to the States, and reiterated that there exists an individual right to possess firearms for self-defense in the home.

In the wake of *Heller* and *McDonald*, "the Courts of Appeals . . . coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." *Bruen*, 597 U.S. at 17. The first step presented the threshold question of whether the regulated activity fell within the scope of the Second Amendment. As the Seventh Circuit explained: "This is a textual and historical inquiry; if the government can establish that the challenged law regulates activity falling outside the scope of the right as originally understood, then the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review." *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019) (cleaned up). If the inquiry

proceeded to the second step, the court would evaluate "the regulatory means the government has chosen and the public-benefits end it seeks to achieve." *Id.*

In *Bruen*, the Supreme Court held that the right to possess a firearm for self-defense included the right to possess one outside of the home. *Bruen*, 597 U.S. at 32. In so holding, the Court overturned the portion of a New York licensing scheme that required those seeking an unrestricted license to carry a firearm outside their home to prove that proper cause existed for the issuance of such license. *Id.* at 13.

Most importantly to the instant matter, the *Bruen* court explicitly declined to adopt the two-step framework employed by the lower courts. *Id.* at 17. The court agreed that step one of that framework was "broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id.* at 19. However, the Court observed, "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id.* "Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.*; see also *id.* at 17 ("[T]he government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'").

Neither *Bruen*, *McDonald*, nor *Heller* called on the Court to consider the constitutionality of § 922(g)(1) or statutes criminalizing possession of firearms by convicted felons generally. Still, each decision touched on that topic to some extent.

4

In *Heller*, for instance, the Court observed that the Second Amendment "elevates above all other interests the right of *law-abiding*, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635 (emphasis added). Moreover, the Court wrote:

> Like most rights, the right secured by the Second Amendment is not unlimited. . . . Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, *nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons* and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id*. at 626-27 (emphasis added). The Court further referred to those "longstanding prohibitions" on, inter alia, possession of firearms by felons, as "presumptively lawful regulatory measures." *Id*. at 627 n.26.

The Court's opinion in *McDonald* made similar references. *McDonald*, 561 U.S. at 790 ("If, as petitioners believe, their safety and the safety of other *law-abiding members of the community* would be enhanced by the possession of handguns in the home for self-defense, then the Second Amendment right protects the rights of minorities and other residents of high-crime areas whose needs are not being met by elected public officials." (emphasis added)). The court also doubled down on its statement from *Heller*:

> We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." We repeat those assurances here. Despite municipal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms.

*Id*. at 786 (quoting *Heller*, 544 U.S. at 626-27).

5

The *Bruen* opinion was no different. The majority opinion in that case referenced "law-abiding" citizens no fewer than 14 times. *Bruen*, 597 U.S. *passim*. Seven more such references may be found in the combined concurrences. *Id*. at 71-83. In a concurrence joined by Chief Justice Roberts, Justice Kavanaugh reiterated that the *Bruen* decision, like *Heller* or *McDonald* before it, did not render the Second Amendment a "regulatory straightjacket," and again recited the passage from *Heller* in which the court stated that "longstanding prohibitions on [inter alia] the possession of firearms by felons" remained "presumptively lawful." *Id*. at 80. Likewise, Justice Breyer in dissent—joined by Justices Sotomayor and Kagan—added: "Like Justice KAVANAUGH, I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding." *Id*. at 129.

<u>Impact of *Bruen* on Constitutionality of Felon-in-Possession Statutes</u>

In three separate cases now, the Supreme Court has both strongly implied and directly stated that statutes criminalizing the possession of a firearm by a felon comport with the Second Amendment, though in all three instances it spoke only through dicta. None of those cases involved a constitutional challenge to such a law. Those dicta have never rested on any means-ends analysis, such that *Bruen*'s repudiation of that test does not undermine the dicta.

While § 922(g)(1) has been consistently found constitutional between the time of *Heller* and *Bruen*, the bases for those holdings are not always the same. In some instances, the finding of constitutionality has rested entirely on the "longstanding prohibitions" dicta in *Heller* and reiterated in *McDonald*. *E.g.*, *United States v. Bogle*, 717 F.3d 281, 281-82 (2d Cir. 2013); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010);

6

*United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010). These decisions, it would seem, survive *Bruen*.

In other instances, and in the Seventh Circuit, the law was upheld only after conducting the now-defunct means-ends analysis. *E.g.*, *Kanter*, 919 F.3d at 445 (refusing "to read too much into the [*Heller*] Court's" dicta, then finding that § 922(g)(1) was constitutional following means-ends analysis). While the *Heller*-dicta-based rationale would seem to survive *Bruen*, the means-ends rationale clearly does not.

Indeed, the Seventh Circuit has recently made that point clear, finding that *Bruen* mandates a new analysis when it comes to the constitutionality of § 922(g)(1). In *Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023), the court took up a constitutional challenge to § 922(g)(1) in the wake of *Bruen*. There the court wrote:

> For its part, the government would have us avoid a *Bruen* analysis altogether. Invoking *Heller* and *McDonald*, it urges us to uphold § 922(g)(1) based on oft-quoted dicta describing felon-in-possession laws as "presumptively lawful." *Heller*, 554 U.S. at 626027 & n.26; see also *McDonald*, 561 U.S. at 786 (plurality) ("We repeat [*Heller's*] assurances here."). The government sees further support for its view in *Bruen* itself. See [597 U.S. at 238] n.9 (explaining that "nothing in our analysis should be interpreted to suggest the unconstitutionality" of public carry licensing schemes requiring applicants to pass a criminal background check).

> Nothing allows us to sidestep *Bruen* in the way the government invites. Yes, the Court seemed to find no constitutional fault with a state requiring a criminal background check before issuing a public carry permit. But in no way did the Court suggest that its observation resolved cases like the one Atkinson brought challenging § 922(g)(1). We must undertake the text-and-history inquiry the Court so plainly announced and expounded upon at great length.

*Id.* at 1022.

7

In the Seventh Circuit, where the constitutionality of § 922(g)(1) has never rested on anything other than the means-ends analysis repudiated in *Bruen*, see *Kanter*, 919 F.3d at 447-451, *Atkinson* makes clear that *Bruen* demands new analysis of the issue.

After finding that "[w]e must undertake the text-and-history inquiry" required by *Bruen*, the *Atkinson* court did not undertake the text-and-history inquiry, instead remanding the matter so that the district court could conduct the inquiry in the first instance, as the lower court's decision had predated *Bruen*. *Atkinson*, 70 F.4th at 1020. There being no controlling Seventh Circuit precedent on the matter, this court now turns to the question of whether § 922(g)(1) survives the constitutional test announced in *Bruen*.

<u>*Bruen*'s Text-and-History Test</u>

After rejecting the means-ends analysis, the *Bruen* court described the proper standard as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 597 U.S. at 24. Having rejected the former test employed by lower courts as "one step too many," the Court adopted a different two-step test. *Id.* at 19. At the first step, a court must determine whether the plain text of the Second Amendment "covers" the conduct at issue. That step is essentially identical to the first step in the former framework, which required the government to demonstrate "that the challenged law

regulates activity falling outside the scope of the right as originally understood," such that "the regulated activity is categorically unprotected." *Kanter*, 919 F.3d at 441 (cleaned up). The *Bruen* court acknowledged as much. *Bruen*, 597 U.S. at 19 ("Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history.").

 If the regulated conduct is not categorically excluded from the scope of the Second Amendment, as defined by its plain text, then the analysis moves to the second step, at which the government must demonstrate "that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 17; see also *United States v. Rice*, 662 F. Supp. 3d 935, 939 (N.D. Ind. 2023) (discussing the "two prongs" of the *Bruen* test); *United States v. Sims*, 2023 WL 6795997, at *2 (C.D. Ill. Oct. 13, 2023) (same).

Accordingly, the court begins at step one, and contemplates whether the plain text of the Second Amendment covers Defendant in this case.

*Plain Text of the Second Amendment*

The Second Amendment guarantees that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. At this first step of the *Bruen* analysis, the court must determine whether Defendant, a convicted felon, is among "the people" whose right to bear arms is protected by the Second Amendment.

In seeking to determine whether that right is an individual one, the *Heller* court had occasion to consider the meaning of "the people." *Heller*, 554 U.S. at 579. The Court began by considering the use of the same phrase in other parts of the Constitution, and observed that the First Amendment's Assembly-and-Petition Clause, the Fourth

Amendment's Search-and-Seizure Clause, and the Ninth Amendment, all of which contain references to "the people," "unambiguously refer to individual rights." *Id*. at 579.

Moreover, the Court noted that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Id*. at 580. In support of that observation, the Court cited to a previous decision in *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990), where it determined that "the people" "to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Heller*, 554 U.S. at 581. The Court, of course, ultimately concluded that the Second Amendment does protect an individual right to bear arms.

With *Heller*'s guidance in mind, the court turns to the competing theories on whether felons are categorically excluded from the scope of the Second Amendment.

**Civic Virtue Theory, the Political Community, and Criticisms**

Under the "civic virtue theory," the Second Amendment's protections are deemed to only extend to law-abiding citizens. See *Rice*, 662 F. Supp. 3d at 943. Stated differently, "the people" contemplated by the Second Amendment is construed as not including felons in the first place. The government argues that this court should adopt such a position, and reject Defendant's challenge at the first step of the *Bruen* analysis.

Courts adopting the civic virtue theory, especially following *Bruen*, have done so in reliance on two different readings of *Heller*. In the more straightforward path, courts have found that *Heller* stands for the proposition that "the people" means "law-abiding citizens." Thus, non-law-abiding citizens are excluded from the scope of the Second Amendment. *E.g.*, *United States v. Hardy*, 2023 WL 6795591, at *2 (N.D. Ill. Oct. 13, 2023) ("The [*Heller* Court] analyzed the text, history, and tradition of the Second Amendment and concluded that the right to bear arms extends only to 'law-abiding citizens'"). But, as discussed above, the Seventh Circuit has explicitly and frequently rejected the notion that *Heller* and its progeny stand directly for that proposition. *Kanter*, 919 F.3d at 445 (refusing "to read too much into the [*Heller*] Court's" dicta); *Atkinson*, 70 F.4th at 1022 (declining invitation to forego *Bruen* analysis "based on oft-quoted dicta describing felon-in-possession laws as 'presumptively lawful'"); *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) ("We do not think it profitable to parse these passages of *Heller* as if they contained an answer[.]").

More commonly, courts have found that the *Heller* Court concluded that "the people" in the Second Amendment means "the political community." *E.g.*, *United States v. Portillo-Munoz*, 643 F.3d 437, 440 (5th Cir. 2011) (finding that Second Amendment did not protect any right of "illegal aliens" to bear arms because they are not part of "the political community"); *United States v. Carpio-Leon*, 701 F.3d 974, 975 (4th Cir. 2012) (same); *United States v. Perez*, 6 F.4th 448, 451 (2d Cir. 2021) ("*Heller* suggested that 'the people' in the text of the Second Amendment is a term of art that refers to members of the 'political community.'").

In the context of felon-in-possession challenges, the question then becomes whether felons are considered members of the political community. "[W]hen it comes to felons, there is a historical tradition of curtailing some core rights associated with being a member of the political community, namely voting and serving on a jury." *Rice*, 662 F. Supp. 3d at 945. If "the people" in the Second Amendment refers to those in the "political community," and the historical tradition of stripping felons of their rights to vote or serve on a jury may be construed as, in essence, removing them from the political community, it follows that the Second Amendment's plain text does not cover convicted felons. As the *Rice* court succinctly stated: "As a matter of basic reasoning it is hard to reconcile how the Framers of the Constitution could conclude that felons could not be trusted to wield pens in voting booths or jury rooms, but they simultaneously found them capable of wielding arms in the public square." *Id*.

A number of courts applying the *Bruen* test to § 922(g)(1) have reached this conclusion, finding that the plain text of the Second Amendment does not cover felons because the stripping of so many political rights removes felons from the political community. See *United States v. Collette*, 630 F. Supp. 3d 841, 847-48 (W.D. Tex. 2022) ("[A]t the time of the Second Amendment's ratification, the right to vote, hold public office, or serve on a jury were thought of as equal to keeping and bearing arms because all were so-called 'political rights,'" (citing Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 48 (Yale University Press 1998)), and "*Heller* defined 'the people' as members of the political community, implying the phrase is limited to those with political rights like voting."); *United States v. Hill*, 2022 WL 17069855, at *4 (S.D.

Tex. Nov. 17, 2022) ("Like voting rights, Second Amendment rights are a privilege afforded to the political community and can be forfeited upon demonstration that an individual does not, or no longer, fits the criteria to be a member of that political community. As understood by precedent, 'the people' is limited to members of the political community—a group decidedly free of felons in critical aspects like voting."); *United States v. Xavier Johnson*, 2023 WL 6276562, at *2 (N.D. Ill. Sept. 26, 2023) ("The 'people' of the Second Amendment are not dangerous felons, so the restriction of their rights to bear arms is not an infringement on the Constitution.").

In addition to the historical support, some courts have opined that this approach best comports with the Supreme Court's strong dicta in *Heller*, *McDonald*, and *Bruen*. *E.g.*, *Hill*, 2022 WL 17069855, at *4 ("[I]nterpreting 'the people' as only including those with certain political rights by virtue of their eligibility to participate in the political community is in perfect harmony with, and in fact explains, the Supreme Court's virtually unwavering reference to only 'law-abiding citizens' when discussing Second Amendment rights."). In other words, even if the Supreme Court has not overtly equated the "political community" with "law-abiding citizens" as one in the same, its strong dicta suggests that it might.

The conclusion that felons are per se excluded from coverage under the Second Amendment is susceptible to two primary criticisms. First, construing "the people" to mean the "political community"—a community from which felons are excluded— would be inconsistent with other uses of "the people" in the Constitution. *United States v. Gates*, 2023 WL 5748362, at *4 (N.D. Ill. Sept. 6, 2023). For example, the Fourth

13

Amendment protects "[t]he right of the people" to be free from unreasonable searches and seizures (U.S. Const. amend. IV), "[b]ut there simply is no categorical removal of felons from Fourth Amendment protection. The same goes for the First Amendment right of the 'people' to peaceably assemble." *Id.* at *4; see also *United States v. Ware*, 673 F. Supp. 3d 947, 955-56 (S.D. Ill. 2023) (finding that an interpretation excluding felons from "the people" in the Second Amendment is inconsistent with usage of similar terms in the First and Fourth Amendments). This inconsistency is especially problematic given that, at bottom, the *Heller* Court's conclusion was that "the people" in the Second Amendment must have the same meaning as "the people" referenced elsewhere in the Constitution. See *Heller*, 554 U.S. at 579; see also *Collette*, 630 F. Supp. 3d at 848 (stating: "*Heller* also states that 'the people' means the same thing throughout the Constitution," and further observing that categorical exclusion of felons from the Second Amendment's protection thus creates a "tension" that remains subject to "an ongoing debate").

The other criticism stems for the recurrent problem of dicta. In *United States v. Meza-Rodriguez*, 798 F.3d 664, 668 (7th Cir. 2015), the Seventh Circuit took up the question of whether unauthorized non-U.S. citizens are among "the people" covered by the Second Amendment. In doing so, that court rejected the idea that any of the language in *Heller* amounted to a full-on definition of the phrase "the people." The court wrote: "While some of *Heller*'s language does link Second Amendment rights with the notions of 'law-abiding citizens' and 'members of the political community,' those passages did not reflect an attempt to define the term 'people.' We are reluctant to place

more weight on these passing references than the Court itself did." *Id*. at 669. Similarly, the Tenth Circuit in *United States v. Huitron-Guizar*, 678 F.3d 1164, 1168 (10th Cir. 2012), declined to find that the *Heller* court had defined the scope of "the people," pointing out that "the question in *Heller* was the amendment's raison d'être—does it protect an individual or collective right?"—as opposed to the separate question of what individuals held the right.

Relatedly, while the Supreme Court has been clear in its "law-abiding citizen" dicta, it is entirely *unclear* at which step of the *Bruen* analysis that dicta would be operative. In other words, is the Second Amendment per se limited to law-abiding citizens in the first place (*i.e.*, the *Bruen* plain text step), or does the law-abiding citizen dicta simply reflect that legislative abridgment of felons' Second Amendment rights passes constitutional muster (*i.e.*, the *Bruen* historical tradition step)?[2]

**Pre-*Bruen* Seventh Circuit Precedent**

Following *Heller*, the Seventh Circuit has addressed the plain text scope of the Second Amendment on three significant occasions, each of which merit discussion here.

---

[2] At least prior to *Bruen*, this distinction was nothing more than a "conceptual point." *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting). Wrote the dissenting judge in that case: "There are competing ways of approaching the constitutionality of gun dispossession laws. Some maintain that there are certain groups of people—for example, violent felons—who fall entirely outside the Second Amendment's scope. Others maintain that all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right. These approaches will typically yield the same result; one uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away." *Id*. at 451-52 (internal citations omitted).

First, in *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010), the court took up a Second Amendment challenge to § 922(g)(3), which prohibits any person who is an unlawful user of or addicted to any controlled substance from possessing a firearm. After noting that "[k]eeping guns away from habitual drug abusers is analogous to disarming felons," the *Yancey* court observed that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *Id*. at 684-85. Ultimately, the court relied on that logic, in part, in upholding the categorical disarmament of habitual drug users by § 922(g)(3). *Id*. at 685. Thus, *Yancey* tacitly endorsed the civic virtue theory, albeit without overtly tying that theory to the plain text of the Second Amendment, *i.e.*, the scope of the phrase "the people."

Five years later, in *Meza-Rodriguez*, the Seventh Circuit considered whether the Second Amendment's plain text covered unauthorized non-U.S. citizens. 798 F.3d at 668. As detailed above, the *Meza-Rodriguez* court rejected as dicta any suggestion that *Heller* directly defined the phrase "the people" as either "the political community" or "law-abiding citizens." *Id*. at 669. In seeking to define the meaning and scope of "the people," the *Meza-Rodriguez* court did rely on *Heller* for one key point. Namely, that phrase in the Second Amendment must have the same meaning as it does elsewhere in the Constitution. *Meza-Rodriguez*, 798 F.3d at 670 ("An interpretation of the Second Amendment as consistent with the other amendments passed as part of the Bill of Rights has the advantage of treating identical phrasing in the same way and respecting the fact that the first ten amendments were adopted as a package" and "[t]he conclusion

16

that the term 'the people' in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights is just the first step in our analysis. We still must decide what it means."). Ultimately, the *Meza-Rodriguez* court adopted a "substantial connections" construction of "the people," in reliance on *Verdugo-Urquidez*, and diverged from three other circuit courts in holding that "the people" in the Second Amendment *did* include unauthorized non-citizens. *Id*.

The holdings in *Meza-Rodriguez* were clear: (1) "the people" in the Second Amendment should not be defined as the "political community" (and that *Heller* on that point was dicta); and (2) that phrase must be construed identically to other appearances of "the people" in the Bill of Rights. Thus, *Meza-Rodriguez* cuts clearly against civic virtue theory or the notion that Second Amendment protections are not extended to felons. Recall that those theories rely indispensably on the premise that "the people" in the Second Amendment must be construed differently from "the people" contemplated by the First and Fourth Amendments, as no one would reasonably suggests that felons may be stripped of their rights to peaceably assemble or to be free from unreasonable search and seizure.

One district court has pointed out the apparent disconnect between the *Yancey* decision and the *Meza-Rodriguez* decision. See *United States v. Posey*, 655 F. Supp. 3d 762, 770-71 (N.D. Ind. 2023). That court observed: "The [*Meza-Rodriguez*] Court instead concluded 'the people' had the same meaning as in other parts of the Bill of Rights. This conclusion would suggest the Seventh Circuit had rejected civic virtue theory as discussed in *Yancey*. However, despite citing to *Yancey*, for a different proposition of

law, the *Meza*[-*Rodriguez*] court never addressed the tension between these two decisions." *Id.* (internal citations omitted).

Finally, four years after *Meza-Rodriguez*, the court decided *Kanter*. As discussed, *Kanter* was a pre-*Bruen* Second Amendment challenge to § 922(g)(1) that the court ultimately decided on the now-repudiated mean-ends analysis. However, before addressing that question, the Seventh Circuit considered the threshold issue of whether convicted felons were categorically excluded from the Second Amendment's scope. *Kanter*, 919 F.3d at 437.

The court began by, again, declining to follow the *Heller* dicta. *Id.* at 445 (citing *Meza-Rodriguez*, 798 F.3d at 669). From there, the *Kanter* court strongly, and repeatedly, endorsed its decision in *Yancey*, writing:

> To be sure, although we have not expressly decided this issue before, we have suggested that felons were not historically understood to have Second Amendment rights. For example, in . . . *United States v. Yancey*, we opined that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens,'" including felons. . . . If, as we suggested in *Yancey* and as most scholars have concluded, the founders conceived of the right to bear arms as belonging only to virtuous citizens, even nonviolent felons like Kanter would fall outside the scope of the Second Amendment.

*Id.* at 445-46 (cleaned up). Still, the court also noted that the question was far from settled. "On the other hand, as Judge Sykes observed in her dissent in *Skoien*, there is scholarly 'disagreement about the extent to which felons were considered excluded from the right to bear arms during the founding era, and the historical evidence is inconclusive at best." *Id.* at 447 (citing *Skoien*, 614 F.3d at 648 (Sykes, J., dissenting) (cleaned up)); see also *id.* at 447 n.8 (collecting authority). Ultimately, the court

demurred, finding that it "need not resolve this difficult issue regarding the historical scope of the Second Amendment to dispose of this case," and proceeding instead to the means-ends analysis. *Id*. at 447.

Confoundingly little in terms of binding precent can be taken from this line of cases. If *Yancey* and *Meza-Rodriguez* were in tension, *Meza-Rodriguez* and *Kanter* are diametrically opposed. See also *Posey*, 655 F. Supp. 3d at 771 ("In *Kanter*, the majority cited to both *Meza*[-*Rodriguez*] and *Yancey* without reconciling the tension between the two in defining 'the people' for purposes of the Second Amendment.").

The *Meza-Rodriguez* decision rested squarely on the court's determination that "the people" in the Second Amendment did not mean the "political community." The *Kanter* passages, while no doubt the Seventh Circuit's strongest language on the issue, are unquestionably dicta. *Yancey*, for its part, exists somewhere in between—the court analogized from its "virtuous citizenry" observation, but that observation was not indispensable to the result. Given the consistency with which the Seventh Circuit has insisted that mere dicta from the Supreme Court should not be given binding effect, it might be presumed that the same is true of its own dicta. *Meza-Rodriguez* seems to be the best candidate for binding precedent.

On the ultimate issue—the scope of the Second Amendment with respect to felons—courts in this district are hopelessly split. See *United States v. Khiry Jackson*, 2023 WL 7160921, at *2-3 (N.D. Ill. Oct. 31, 2023) (collecting cases). Of the courts finding that felons are not categorically excluded from the Second Amendment, at least one has done so in explicit reliance on *Meza-Rodriguez*. *United States v. Freeman*, 2023 WL

7325934, at *5 (N.D. Ill. Nov. 7, 2023). Of the courts that have found the Second

Amendment does *not* extend to felons, few have seen fit to expressly distinguish *Meza-

Rodriguez*. But see *Xavier Johnson*, 2023 WL 6276562, at *2 (rejecting the idea that *Meza-

Rodriguez* was outcome determinative because it was decided before *Bruen* and "*Heller*'s

statement—that the Second Amendment protects only law-abiding people—can no

longer be considered a 'passing reference' by the Supreme Court" after *Bruen*).

The *Xavier Johnson* analysis is unconvincing. First, while the *Bruen* Court

announced that the first step of a Second Amendment analysis must be a determination

as to the scope of the plain text, it did not expound on that process, and it certainly did

not make such a determination with respect to felons. Thus, it is unclear what impact it

would have on that portion of *Meza-Rodriguez*. And the suggestion that the *Heller-

McDonald-Bruen* dicta should now be considered binding simply because there is so

much of it is easily dismissed, given the Seventh Circuit's consistent position that the

Supreme Court's Second Amendment dicta should not be elevated into binding

precedent. *Meza-Rodriguez*, 798 F.3d at 669; *Kanter*, 919 F.3d at 445; *Atkinson*, 70 F.4th at

1022. That the Supreme Court added even more dicta in *Bruen* does not change

anything.

A more compelling case for declining to follow *Meza-Rodriguez* comes from *Posey*,

a case in which the district court meticulously detailed the Seventh Circuit's evolving

positions. That court wrote:

> It is tempting to embrace the conclusion in *Meza*[*-Rodriguez*] as the most direct
> guidance on this question. However, the Court will decline to do so for three
> reasons. First, as previously discussed, *Kanter* suggests that *Meza*[*-Rodriguez*] did

not actually decide this issue and there is no binding precedent to be applied. Second, individual panels of the Seventh Circuit cannot implicitly override prior panel decisions. *Brooks v. Walls*, 279 F.3d 518, 522 (7th Cir. 2002) ("One panel of this court cannot overrule another implicitly."). Therefore, to the extent *Yancey* made a holding on the scope of "the people" for Second Amendment purposes that decision could not be overridden implicitly by *Meza*[-*Rodriguez*]. Or to the extent *Kanter* sought to overturn a holding in *Meza*[-*Rodriguez*], the same impediment applies. Third, the *Meza*[-*Rodriguez*] court acknowledged its decision was in conflict with at least three other circuits at the time. 798 F.3d at 669 (citing Fourth, Fifth, and Eighth Circuit decisions). It is possible that in light of *Bruen*, the Seventh Circuit would reach a different conclusion based on additional guidance provided in that case and subsequent developments in other circuits.

*Posey*, 655 F. Supp. 3d at 771.

The court finds the first two points especially persuasive.[3] *Meza-Rodriguez* cannot have implicitly overruled *Yancey*, which tacitly endorsed civic virtue theory in the first place. And if *Meza-Rodriguez* is binding precedent, the *Kanter* court surely did not think so.

Given the conflicting language in the Seventh Circuit, the *Posey* court ultimately took the same path as the *Kanter* court: it punted. The court wrote: "As this case can be resolved on the second prong of *Bruen*, the Court will leave this question for the Seventh Circuit to resolve." *Id.* at 771. The court assumed without deciding that felons are part of "the people" covered by the Second Amendment, and proceeded to the second step of the *Bruen* analysis. The *Rice* court took the same tack. *Rice*, 662 F. Supp.

---

[3] As to the third point, the possibility that the Seventh Circuit would reach a different conclusion because of *Bruen*'s added dicta is, as discussed elsewhere, foreclosed by *Atkinson*. As for the fact that *Meza-Rodriguez* was an outlier in finding that the Second Amendment's scope extended to unauthorized non-citizens, the court readily acknowledged as much in its decision, suggesting that the conflict would not be the basis for any reconsideration.

3d at 945 ("In light of this and the mixed guidance from the Seventh Circuit on the civic virtue theory, the Court will decline to decide the issue in this case. For the purposes of this motion the Court will assume, without deciding, Mr. Rice's possession of a firearm is facially covered by the protective ambit of the Second Amendment."); see also *United States v. Wigfall*, 2023 WL 4014183, at *3 (N.D. Ind. June 15, 2023) ("The court will assume the Second Amendment applies and proceed directly to the historical analysis — a not uncommon practice.").

This court will take the same approach. Civic virtue theory is certainly appealing. It has been endorsed at least twice by the Seventh Circuit, albeit once purely in dicta. And *Heller* equated "the people" of the Second Amendment with the "political community," a community from which, historical practice indicates, one may be removed upon conviction for a felony. Yet, the Seventh Circuit called that part of the *Heller* opinion dicta, and has explicitly held that "the people" must be given the same construction in all of the phrase's appearances in the Bill of Rights. It went on to hold in *Meza-Rodriguez* that the scope of the Second Amendment extends to unauthorized non-citizens, people who, by definition, are not law-abiding. In light of this mixed guidance from the Seventh Circuit, the court will assume, without deciding, that felons are among "the people" protected by the Second Amendment, and will proceed to the second step of the *Bruen* test.

*Historical Tradition*

At the second step of the *Bruen* test, the court must consider whether § 922(g)(1) "is consistent with this Nation's historical tradition." *Bruen*, 597 U.S. at 17.

Almost every court in the Seventh Circuit that has reached this question—indeed, nearly every court in the country—is in agreement. Section 922(g)(1)'s prohibition on the possession of a firearm by convicted felons is very much consistent with the country's historical tradition of firearms regulation, and therefore passes constitutional muster. *E.g.*, *Rice*, 662 F. Supp. 3d at 946 ("[E]ven if the previously discussed historical evidence will not be used to define the scope of the Second Amendment right, it is nonetheless useful for defining the scope of the legislature's power to take that right away."); *Posey*, 655 F. Supp. 3d at 774 ("It is well established that there is a history and tradition in the United States of disarming persons who would pose a threat to public safety if allowed to possess firearms."); *United States v. Reggie Johnson*, 2023 WL 6690388, at *8 (N.D. Ill. Oct. 12, 2023) ("[H]istory does not support an individualized assessment of 'violent' versus 'non-violent' in determining who should be disarmed, but rather, categorical bans based on membership to a 'dangerous' or 'untrustworthy' group."); *United States v. Agee*, 2023 WL 6443924, at *11 (N.D. Ill. Oct. 3, 2023); *Khiry Jackson*, 2023 WL 7160921, at *6; *United States v. Watson*, 2023 WL 6623774, at *6 (E.D. Wis. Oct. 11, 2023) (noting that § 922(g)(1) has been upheld "in approximately 200 separate rulings" since *Bruen*); *United States v. Javion Johnson*, 2023 WL 7284848, at *7-8 (E.D. Wis. Nov. 3, 2023); *Ware*, 673 F. Supp. 3d at 959 ("[T]here is evidence that categorical bans are permissible and that individuals who have been deemed dangerous, non-law abiding, or even reasonably likely to breach the peace may have their right to keep and bear arms restricted."); *United States v. Sloat*, 2023 WL 8455112, at *6 (S.D. Ill. Dec. 6, 2023) ("[T]he Court finds, as others before it have, that §

922(g)(1) is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms under the Second Amendment."); *United States v. Bell*, 2023 WL 8475814, at *6 (N.D. Ill. Dec. 7, 2023) ("[T]he Court finds that § 922(g)(1) is sufficiently analogous to historical felon-punishment and firearm-dispossession regulations to survive Second Amendment scrutiny."); *United States v. Ieliot Jackson*, 2023 WL 8601498, at *12 (N.D. Ill. Dec. 12, 2023) ("agree[ing] with the majority of district courts in this Circuit (and nationwide)"); but see *United States v. Prince*, 2023 WL 7220127 (N.D. Ill. Nov. 2, 2023) and *United States v. Neal*, 2024 WL 833607, at *12 (N.D. Ill. Feb. 7, 2024) .

The *Bruen* Court recognized that, in evaluating the validity of present-day firearm regulations, the historical inquiry to be conducted by courts "will often involve reasoning by analogy." *Bruen*, 597 U.S. at 28. *Bruen* then provided "two metrics" to be applied by courts in evaluating whether a historical regulation is "relevantly similar" to a modern firearm regulation, and therefore can serve as a proper analogue for the present-day law: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 29. Finally, the Court made clear that such analogical reasoning requires only the identification of "a well-established and representative historical analogue, not a historical twin." *Id* at 30.

The historical tradition in question has been set out at great length by the courts listed above and others. "The disarmament of persons who were considered dangerous or a threat to public safety has strong roots in English tradition. England's 1662 Militia Act empowered officers of the Crown to disarm anyone they judged to be 'dangerous to the Peace of the Kingdom.'" *United States v. Barber*, 2023 WL 1073667, at *8 (E.D. Tex.

Jan. 27, 2023) (citing Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13 (1662)). "Even under the English Declaration of Rights, no one thought anything of disarming people who were not loyal to the Crown, or who had committed serious crimes (called felonies). . . . This history and tradition follows an unbroken line from long before the Constitution was written, through the 17th and 18th centuries up to the present day." *Atkinson*, 70 F.4th at 1037-38 (Wood, J., dissenting).

The English history is relevant because, as the *Heller* court pointed out, the Second Amendment does not bestow a new right, but protects a pre-existing one "inherited from our English ancestors." *Heller*, 554 U.S. at 599 (cleaned up). Thus, during the American Revolution, numerous laws were adopted that stripped persons of their right to keep and bear arms if they did not demonstrate allegiance to the new government, suggesting that legislatures held the authority "to decide when individuals would have their right to keep and bear arms taken based upon actions that did not comport with the law." *Ware*, 673 F. Supp. 3d at 958 (citing *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 1993 (1890) (1775 Conn. Law); *Journals of the Continental Congress* 1774-1789, at 205 (1906) (resolution of March 14, 1776); *The Statutes at Large; Being A Collection of All the Laws of Virginia*, at 282 (1821) (1777 Va. Law)); see also *Yancey*, 621 F.3d at 684 ("[I]t cannot be disputed that states were regulating firearms as early as the nineteenth century.").

It has also been commonly observed that "during the 18th century leading to the ratification of the Bill of Rights felons were largely subject to capital punishment." *Ware*, 673 F. Supp. 3d at 959 (citing 4 William Blackstone, Commentaries on the Laws of

England *98 (Harper ed. 1854)); see also *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 105 (3d Cir. 2023) ("States in the early Republic likewise treated nonviolent crimes 'such as forgery and horse theft' as capital offenses."). "As a matter of logic and experience," one court in this circuit has pointed out, "it makes sense that these extensive and exhaustive penalties for felonies—outright capital punishment and the forfeiture of all property—qualify as powerful evidence that mere firearms dispossession of felons is a 'comparable burden,' as *Bruen* frames the standard to historical punishments for felonies." *Agee*, 2023 WL 6443924, at *10; see also *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) ("With this perspective, it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms.").

Finally, this court returns to the dicta in *Heller*, *McDonald*, and *Bruen*. Recall that the *Heller* court referred to laws barring possession of firearms by felons to be "longstanding" and "presumptively lawful." And the Court in *McDonald* and *Bruen* has continued to make myriad reference to "law-abiding citizens" in the Second Amendment context. While these cases, all from 2010 or later, cannot be said to form the "historical tradition" contemplated in *Bruen*, they undoubtedly *reflect* that tradition. In other words, that the Supreme Court has so frequently referred in passing to law-abiding citizens, without second guess or further analysis, supports what the historical record makes clear: prohibitions on the possession of firearms by convicted felons find longstanding support under this nation's historical tradition.

In reaching this conclusion, the court is aware of the result reached by a divided en banc Third Circuit panel in *Range*, 69 F.4th 96.[4] In that case, the court, applying the *Bruen* test, found § 922(g)(1) unconstitutional as applied to a defendant who committed the offense of making a false statement to procure food stamps decades earlier. *Id*. at 98, 107. The court found that the government failed to prove that this nation "has a longstanding history and tradition of depriving people like Range of their firearms." *Id*. at 106.

Regarding *Range*, the court in *Javion Johnson* wrote:

> [I]n requiring the government to identify historical regulations targeting people like Range, the court demanded the impossible. As one of the dissenting judges noted, the majority never really specified what makes a person "like Range," *id*. at 132 (Krause, J., dissenting), instead citing a variety of sympathetic circumstances: Range's non-violent predicate offense, the mitigated nature of his crime, his probationary sentence, his law-abiding life post-conviction, and his reason(s) for wanting a gun. Of course, no colonial or reconstruction era legislature passed laws specifically disarming persons with all of these "individual circumstances."

2023 WL 7284848, at *7.

Indeed, even if this court *was* inclined to adopt the rationale in *Range*, or any other similar case finding § 922(g)(1) unconstitutional as applied, it is not clear that that would be of any help to Defendant. As the *Javion Johnson* court observed, the result in *Range* was premised explicitly on Range's distinctive characteristics—his nonviolent predicate felony chief among them. See *Range*, 69 F.4th at 106 ("Our decision today is a

---

[4] The U.S. Supreme Court has since vacated the Third Circuit's judgment in *Range* and remanded for further consideration in light of is decision in *United States v. Rahimi*, 144 S. Ct. 1889, 1891 (2024); *Garland v. Range*, 2024 WL 3259661, at *1 (U.S. July 2, 2024) (vacating and remanding).

narrow one…. [T]he Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range.”). As explained at the outset, Defendant here has not argued that he is a nonviolent felon, or that the court should find § 922(g)(1) unconstitutional as applied to him on such a basis.[5]

In sum, the courts finds that the historical evidence dictates that § 922(g)(1) is constitutional on its face. Accordingly, Defendant's Motion to Dismiss must be denied.

IT IS THEREFORE ORDERED THAT:

Defendant's Motion to Dismiss (#33) is DENIED

ENTERED this 30th day of July, 2024.

s/Colin Stirling Bruce
COLIN S. BRUCE
U.S. DISTRICT JUDGE

---

[5] The court is also aware of the result in *Prince*, and a number of subsequent cases in which that court found § 922(g)(1) to be unconstitutional on its face. *United States v. Hale*, 2024 WL 621614, at *6 (N.D. Ill. Feb. 14, 2024); *Neal*, 2024 WL 833607, at *12; *United States v. Diaz*, 2023 WL 8019691 (N.D. Ill. Nov. 20, 2023); *United States v. Anderson*, 2023 WL 7531169 (N.D. Ill. Nov. 13, 2023); *United States v. Salme-Negrete*, 2023 WL 7325888 (N.D. Ill. Nov. 7, 2023); *United States v. Daniel*, 2023 WL 7325930 (N.D. Ill. Nov. 7, 2023); *United States v. Delaney*, 2023 WL 7325932 (N.D. Ill. Nov. 7, 2023); *United States v. Freeman*, 2023 WL 7325934 (N.D. Ill. Nov. 7, 2023). Those cases, however, remain outliers in the Seventh Circuit, and this court will join with the others that have rejected that result. *E.g.*, *United States v. Calhoun*, 2024 WL 36977, at *6 (N.D. Ill. Jan. 3, 2024) (“[T]he Court respectfully disagrees with the reasoning in *Prince* and instead joins the majority of courts in this District and across the nation to find that § 922(g)(1) is constitutional under the framework articulated by *Bruen* and explained in *Atkinson*.”).